# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JESSICA K., | ) | |
| | ) | |
| Plaintiff, | ) | No. 19-cv-4380 |
| | ) | |
| v. | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| ANDREW M. SAUL, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jessica K.[1] appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her disability benefits. The parties have filed cross motions for summary judgment.[2] As detailed below, Plaintiff's motion for summary judgment [dkt. 10] is DENIED; Defendant's motion for summary judgment [dkt. 17] is GRANTED.

## I.    Background

### a.    Procedural History

Plaintiff was born in 1979. [Administrative Record ("R.") 32.] Plaintiff alleged a disability onset date of March 15, 2015 in her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[3] [R. 306-318.] On September 6, 2018, after an administrative hearing, Administrative Law Judge ("ALJ") Kimberly Cromer issued an unfavorable decision. [R 19-33.] Plaintiff

---

[1]    In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff only by her first name and the first initial of her last name(s).

[2]    Defendant has filed a Response to Plaintiff's Motion for Summary Judgment [dkt. 17] that seeks summary judgment in its *ad damnum* paragraph, which the Court therefore construes as a motion for summary judgment.

[3]    There are multiple notations within the Administrative Record reflecting when Plaintiff might have filed for benefits. Specifically, R. 306 indicates a protected filing date of August 15, 2015 for DIB; R. 308 and R 315 indicate a protected filing date of July 14, 2016 for both DIB and SSI; and at R. 19, the ALJ's opinion indicates without citation that Plaintiff's protected filing date for DIB and SSI is June 17, 2016. Finally, the index to the Administrative Record classifies a document within the record as a "Statement of Good Cause for Untimely Filing," (referring to R. 188-190) but the Court cannot discern any more information from the index or the referenced letter concerning any late filing. Regardless, as Defendant has not raised (and thus waived) the issue of timely filing, the Court considers Plaintiff's claims as timely filed.

requested Appeals Council review, which was denied on April 24, 2019. [R. 1-3.] Thus, the Decision of the Appeals Council is the final decision of the Commissioner. Plaintiff, through counsel, filed the instant action on June 28, 2019, seeking review of the Commissioner's most recent decision. [Dkt. 1.]

b.    **Relevant Background**

Plaintiff graduated high school and attended one year of college. [R. 496.] Plaintiff "reported that she was raped at the age of 16 but does not believe it had any effect on her life or symptoms." [R. 495.] Plaintiff was later married to a man who abused her, and was then in a relationship with an abusive boyfriend. [R. 81.]

Plaintiff stopped working in March 2015 because she "just flipped out." [R. 74.] Her mother had died a few months prior, she was in an abusive relationship, and her symptoms of depression, anxiety, and bipolar disorder came to the forefront. [R. 74-75.] Being around people exacerbated her anxiety. [R. 77.] She was unable to focus and would need to step away to take a break, and she also began missing days at work. [R. 76-77.] Her managers never expressed any problems with this behavior. [R. 76.] During her Behavioral Health Assessment, Plaintiff reported that she had quit her job because "it was 'too much spare time,' and she would have a lot of time to think about things which made her symptoms worse for her." [R. 581.]

Around March 2015, Plaintiff began to report anxiety and daily panic attacks with associated palpitations, shortness of breath, and chest pain. [R. 469, 472, 474, 477.] In April 2015, Plaintiff reported she was sexually assaulted by an acquaintance; she later filed a police report. [R. 82, 496-97, 477, 480, 582, 602, 624.] The day after her April 2015 acquaintance rape, Plaintiff was seen in the emergency department for suicidal ideation but no plan; Plaintiff testified that she was hospitalized at this time (but the Court cannot find any Record support that she was admitted). [R. 77, 472 (seen in ED), 496 ("held" at the emergency room), 505 (not admitted), 529 (seen in ED, allowed to go home).] At the time, Plaintiff was referred for specialized mental health services, including therapy, psychiatric medication management,

2

and in-home community support services. [R. 469, 472, 474, 477.]

In June 2015, Plaintiff began receiving therapy from Melissa Kain, Q.M.H.P., and on June 18, 2015, Plaintiff underwent a Behavioral Health Assessment. [R. 495-501.] Mental status examination revealed an anxious, depressed, and despairing mood, and Plaintiff "cried and trembled throughout most of the assessment." [R. 498.] Plaintiff reported getting along with her family and children, and that "visiting with friends" was one of her activities. [R. 496-97.] Plaintiff also reported that she "wants to find a job." [R. 500.]

In July 2015, she began receiving psychiatric care with Dr. Nageswara Nagarakanti, M.D. [R. 507.] Plaintiff reported symptoms of isolation, decreased appetite and sleep, racing thoughts, edginess, crying spells, and feelings of helplessness and hopelessness. [R. 500-505.] She also reported recurrent thoughts of past physical abuse and the sexual assault that occurred in April 2015. *Id.* Dr. Nagarakanti diagnosed Plaintiff with major depressive disorder, anxiety disorder, and PTSD. [R. 506.]

In October 2015, Ms. Kain wrote a letter in support of Plaintiff's disability application, opining that Plaintiff was not psychiatrically stable as a result of debilitating mental illness, and thus, she was unable to work. [R. 588-89.] In January and February 2016, Ms. Kain documented several incidents during which Plaintiff injured herself by cutting. [R. 558, 563, 567.] On one such occasion, she went to the emergency room, where the triage note indicated Plaintiff "wanted to hurt [her]self," but denied any suicidal ideation. [R. 638.]

Plaintiff formally began receiving community support services in February 2016. [R. 26, 500, 775, 856-905.] These services were supposed to be provided once a week at Plaintiff's home, but they often occurred further apart, and many times only consisted of a short phone call between Plaintiff and her case manager rather than a home visit. [R. 856-905.] The community support services Plaintiff received consisted of, *inter alia*, listening to client's stressors and issues of concern; providing assistance with paperwork to receive public entitlements, loans, help paying utility bills, etc.; providing assistance with

gathering documentation and prerequisites for medical appointments or disability eligibility; and occasionally accompanying Plaintiff to various governmental/public utilities. *Id.*

In February 2016, Plaintiff reported to Ms. Kain that she had stopped her self-injurious behavior. [R. 556.] She attributed the decrease in self-injury to having no contact with her abusive boyfriend, but also mentioned she was considering letting him move in with her. *Id.* In April 2016, Dr. Nagarakanti noted Plaintiff was somewhat less depressed, but was tearful during the session; the following month, she was hyperverbal with racing thoughts and a euthymic mood.[4] [R. 596-97.] Plaintiff's March 2017, July 2017, January 2018, and March 2018 mental status examinations were relatively unremarkable, and Plaintiff was encouraged to see a therapist regularly. *Id.*

In April 2016, Plaintiff underwent a consultative psychiatric examination. [R. 686-89.] Cognitive functioning was relatively unremarkable. [R. 688.] Mental status examination revealed an anxious, nervous, and uneasy mood; speech quality was low, but interaction style was open. *Id.* The examiner diagnosed Plaintiff with bipolar I disorder, most recent episode depressed. [R. 689.] The examiner noted Plaintiff takes prescription medication, and works with a psychiatrist and two therapists. *Id.*

In August 2016, Ms. Kain completed a Function Report in which she opined that Plaintiff's mental impairments affect her ability to remember, complete tasks, concentrate, understand, follow instructions, and get along with others. [R. 389-96.] She noted that Plaintiff has fear and anxiety around others and isolates herself, and has no family support or friends. [R. 394-95.] Later that same month, in a second letter in support of Plaintiff's disability application, Ms. Kain again opined that Plaintiff was not psychiatrically stable due to debilitating mental illness, and is unable to work. [R. 774-76.]

In August 2016, Dr. Nagarakanti signed off on a Psychiatric Report (that appears to have been completed by Ms. Kain),[5] opining that Plaintiff has serious limitations with the ability to independently

---

[4] Euthymia is defined as "1. Joyfulness; mental peace and tranquility. 2. Moderation of mood, not manic or depressed. *Stedman's Medical Dictionary* (Nov. 2014).

[5] *Compare* R. 389-96 *with* R. 770-73 and *with* 1052-55.

initiate, sustain, or complete tasks, understand, carry out, and remember instructions on a sustained basis, respond appropriately to supervisors, coworkers, and customary work pressure, and perform tasks on an autonomous basis without direct step-by-step supervision and direction. [R. 772.]

In November 2016, Janesa Roman, M.H.P./B.A., one of Plaintiff's case managers at the Association for Individual Development, submitted a letter in support of Plaintiff's request for reconsideration of her disability application, in which Ms. Roman stated that Plaintiff continued to struggle with low motivation, lack of self-care, psychiatric instability, financial instability, decreased appetite, and decreased sleep. [R. 915-16.] She noted that Plaintiff exhibits functional impairment as a result of her bipolar disorder, anxiety, and PTSD, and opined that her symptoms make it difficult for her to obtain or sustain employment. *Id.* She explained that Plaintiff is always on edge, overwhelmed, and shaky, and has been unable to maintain a job. *Id.*

In June of 2018, Dr. Nagarakanti noted that Plaintiff's "mental health has declined due to chronic stressors including history of abuse and trauma from domestic violence, job loss, loss of family home, etc." [R. 1055.] Dr. Nagarakanti noted that Plaintiff has "frequent panic attacks that cause her to leave work." [R. 1054.] Dr. Nagarakanti also opined that Plaintiff "is unable to manage symptoms and life stressors to work consistently." [R. 1055.]

Plaintiff testified at the Administrative hearing that a result of her PTSD, she cries daily and has a hard time being around people. [R. 83.] Plaintiff reported that her symptoms make her get overwhelmed when she has to do anything, particularly at work. [R. 86-87.] Plaintiff does not think she could even handle a simple job where she did not have to talk to anyone much. [R. 88.] In an April 2016 Psychological Evaluation, Plaintiff commented to the evaluator, "Physically I can work, but mentally, I haven't been in a space where I feel comfortable in a work-related environment." [R. 687.] In April 2016, Plaintiff had been applying for work, but gave up trying; Plaintiff reported that "she plans to return to work soon." *Id.* On October 7, 2016, Plaintiff reported to her case manager that she was fired from her job (seemingly

that very day) because she was "unable to work the schedule that was given to her by her boss…she was never informed she was supposed to work today, so she did not go in." [R. 891-92.]

c.   **The ALJ's Decision**

On September 6, 2018, the ALJ issued a written decision denying Plaintiff disability benefits. [R. 19-33.] At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of March 15, 2015. [R. 22.] At Step Two, the ALJ found that Plaintiff had the severe impairments of bipolar I disorder/depression; anxiety; and posttraumatic stress disorder ("PTSD"). *Id.* The ALJ determined that Plaintiff's acute sinusitis/asthma; hypoglycemia; history of sprain of the left middle finger; history of alcohol abuse; and history of vasovagal syncope were nonsevere impairments. [R. 22-23.] At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of 20 C.F.R. Part 404, Subpart P, App'x 1. [R. 23-25.] Before Step Four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following limitations: she must avoid concentrated exposure to temperature extremes and pulmonary irritants; she can never climb ladders, ropes, or scaffolds, and cannot perform work around hazards or unprotected heights; she cannot work with the general public as part of her routine job duties; she can have only occasional interaction with co-workers and supervisors; she must be able to perform variable-rate work, and cannot perform with work with an assembly line or work where the machine sets the pace; she cannot perform tandem work; she is limited to simple, routine work with only occasional decision making and changes in the work setting. [R. 25.] At Step Four, the ALJ determined that Plaintiff was not capable of performing her past relevant work as a nurse assistant (DOT# 355.674-014); area supervisor, retail (DOT# 185.117-014); or department manager (DOT# 299.137-010). [R. 31.] At Step Five, however, the ALJ found Plaintiff capable of performing other jobs existing in significant numbers in the national economy. [R. 32.] Because of these determinations, the ALJ found Plaintiff not disabled under

the Act. [R. 33.]

## II.  Social Security Regulations and Standard of Review

The Social Security Act requires all applicants to prove they are disabled as of their date last insured to be eligible for disability insurance benefits. ALJs are required to follow a sequential five-step test to assess whether a claimant is legally disabled. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; and (3) whether the severe impairment (or combination of impairments) meets or equals one considered conclusively disabling such that the claimant is impeded from performing basic work-related activities. 20 C.F.R. § 404.1520; 20 C.F.R. § 404.1523; 20 C.F.R. § 404.1545; 20 C.F.R. § 416.920(a)(4)(i)-(v). If the impairment(s) does meet or equal this standard, the inquiry is over and the claimant is disabled. 20 C.F.R. § 416.920(a)(4). If not, the evaluation continues and the ALJ must determine (4) whether the claimant is capable of performing his past relevant work. *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981). If not, the ALJ must (5) consider the claimant's age, education, and prior work experience and evaluate whether she is able to engage in another type of work existing in a significant number of jobs in the national economy. *Id.* At the fourth and fifth steps of the inquiry, the ALJ is required to evaluate the claimant's RFC in calculating which work-related activities she is capable of performing given his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In the final step, the burden shifts to the Commissioner to show that there are jobs that the claimant is able to perform, in which case a finding of not disabled is due. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984).

A court's scope of review in these cases is limited to deciding whether the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation and signals omitted). The Court reviews the ALJ's decision directly, but plays an

"extremely limited" role in that the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir.2008); *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted). The Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support, an adequate discussion of the issues, or is undermined by legal error. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also*, 42 U.S.C.§ 405(g). However, even if reasonable minds could disagree about whether Plaintiff is disabled, the court must nevertheless affirm the ALJ's denial of benefits if it is adequately supported. *Elder*, 529 F.3d at 413.

## III.    Discussion

Plaintiff alleges the ALJ erred in three areas when evaluating her claims: (1) the Step Three analysis; (2) the analysis of Plaintiff's subjective symptoms; and (3) the adoption of consultative expert opinions over the opinions of Plaintiff's treaters. In all three arenas, Plaintiff largely asks the Court to reweigh the evidence, which the Court is unable to do. *See Young*, 362 F.3d at 1001. As such, the Court cannot find that the ALJ failed to do a thorough job in her denial of Plaintiff's disability benefits, and the Court must therefore affirm the final decision of the Commissioner as discussed below.

### a.    Step Three Analysis

Plaintiff asserts the ALJ did not give meaningful enough analysis to her Step Three analysis to explain the restrictions she ultimately included in Plaintiff's RFC. The Court disagrees; at its core, Plaintiff's challenge is a subjective disagreement with the ALJ's judgment, which is not a basis for reversal. *See Stephens*, 888 F.3d at 327.

Once again, at Step Three, an ALJ is to assess whether a claimant has an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments

of 20 C.F.R. Part 404, Subpart P, App'x 1. As to the listings themselves, the medical criteria for the listings are set at a higher level than the statutory disability standard because the listings are "designed to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990); *see also Ronald B. v. Berryhill*, 2019 WL 2173776, at *2 (N.D. Ill. May 20, 2019). To support reversal, Plaintiff bears the burden of identifying the evidence to prove her "impairments satisfy all of the various criteria specified in the listing" and, thus, she would have satisfied the Step Three criteria if the ALJ had considered the relevant issues. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2005); *Heuschmidt v. Colvin*, 2015 WL 7710368, at *3 (N.D. Ill. Nov. 30, 2015); *see also* 20 C.F.R. § 404.1525(d).1.

To satisfy a mental impairment listing, Plaintiff had to prove that she met the severity criteria of either Paragraph B or Paragraph C. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06, 12.15. To satisfy the Paragraph B criteria, plaintiff had to prove an "[e]xtreme limitation of one, or marked limitation of two" of four areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting and managing oneself. *Id.* To satisfy the paragraph C criteria, she had to prove a "serious and persistent" mental disorder with evidence of both (1) ongoing medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) and (2) marginal adjustment, meaning "minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life…" *Id.* Section 12.00 clarifies that marginal adjustment "means that your adaptation to the requirements of daily life is fragile," with evidence showing "that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports…" *Id.* § 12.00G2c. This level of deterioration "may have necessitated a significant change in medication or other treatment" or required hospitalization. *Id.*

Plaintiff begins her first argument by stating that she "does not argue that the ALJ should have

9

found listing level severity." [Dkt. 10, p. 8.] Instead, Plaintiff asserts the ALJ did not give "any meaningful analysis" at Step Three to explain the restrictions she included in the RFC finding, which, in turn, led to an inadequate RFC assessment later. *Id.* However, as set forth above, the ALJ's task at Step Three is to assess whether Plaintiff proved her impairments satisfied all requirements of a listing – in fact, as the ALJ's decision explains, the "limitations identified in the 'Paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process" [R. 24.]; *see* 20 C.F.R. § 404.1520a(d)(1)-(2). The RFC assessment comes *after* Step Three. *Id.*; 20 C.F.R. § 404.1520a(d)(3) (if SSA finds severe mental impairments that do not meet or equal any listing, "we will then assess RFC"); *Young*, 362 F.3d at 1000 (ALJ considers RFC "[a]t the fourth and fifth steps").

Therefore, what Plaintiff asks the Court to do in her first argument is to assess how adequately the ALJ analyzed the medical evidence during the Step Three analysis. The evidence the ALJ considered – Plaintiff's performance during psychological testing at the consultative examination, her reported ability to get along with authority figures and history working with others, and her ability to concentrate on activities and perform household tasks – is evidence ALJs are instructed to consider at Step Three. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F3 (in rating the degree of limitation, ALJs consider all relevant medical and non-medical evidence, as well as the claimant's activities). The Court finds the ALJ's decision shows she considered Plaintiff's subjective reports of limitations and weighed them along with relevant record evidence of Plaintiff's functioning in making a judgment about Plaintiff's degree of restriction in each Paragraph B area. [R. 23-24.]

Specifically, when analyzing Plaintiff's ability to understand, remember, or apply information, the ALJ compared Plaintiff's self-reported issues with following instructions with her ability to recite both immediate- and delayed-recall items during the psychological consultative examination, as well as her fund of general knowledge, her awareness of current events, and her ability to complete assigned

multi-step tasks. [R. 23.] When analyzing Plaintiff's ability to interact with others, the ALJ compared Plaintiff's self-reported issues in this area with Plaintiff's self-report that she gets along "pretty well" with authority figures, as well as the fact she has never lost a job due to conflicts with others, that she interacts with others during her bi-weekly grocery store trips, and that she drives a motor vehicle (presumably this involves understanding social cues and appropriately interacting with the motoring public during all traffic situations). [R. 23-24.] When analyzing Plaintiff's abilities in the areas of concentrating, persisting, or maintaining pace, the ALJ compared Plaintiff's self-reported issues in this area (not finishing tasks and not handling stress or changes in routine well) with Plaintiff's reports that she watches television without issue and that she drives a car ("which necessarily requires maintaining a vehicle in a lane of traffic, adhering to traffic signs and signals, responding to changes in traffic patterns, and following or remembering directions to get from place to place"), as well as results from Plaintiff's psychological consultative examination.[6] [R. 24.] When analyzing Plaintiff's abilities adapting or managing oneself, the ALJ weighed factors such as Plaintiff's 2015 hospitalization for suicidal ideation and Plaintiff's need for in-home community support services once a week, against the fact Plaintiff lives alone in a house, cares for herself and her household (*e.g.*, personal hygiene, cooks simple frozen meals, cleaning, laundry), cares for her children a few days a week, drives a car, and shops for groceries bi-weekly.[7] *Id.*

---

[6]    Plaintiff argues the ALJ "essentially dismissed Plaintiff's inability to complete tasks or handle stress or changes in routine," but provides no evidence in support of her claims. [Dkt. 10, p. 9.] The Court "will not scour a record to locate evidence supporting a party's legal argument." *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005); *see also*, *Herrman v. Astrue*, 2010 WL 356233, at *12 (N.D. Ill. Feb. 1, 2010) (same). Nonetheless, the Court notes that Ms. Kain's August 2016 Function Report details that Plaintiff easily gets distracted ("can only focus for about 10 min. at a time"), but also details that Plaintiff is able to complete tasks (laundry, cleaning, vacuuming) even though it may take her several hours. [R. 391, 394.] The Court does not believe the ALJ's consideration of this specific information, in toto with the factors the ALJ specifically detailed, would alter the ALJ's conclusions about Plaintiff's abilities in the areas of concentration, persistence, or pace, particularly because the ALJ accounted for such limitations in the RFC (*i.e.*, only variable-rate work; no assembly line work or work where the machine sets the pace; only simple, routine work with only occasional decision making). [R. 25.]

[7]    While one might wonder whether Plaintiff is only able to do these things because she gets in-home community support (Plaintiff does not make this argument), the Court has reviewed the notes related to Plaintiff's community support visits and phone calls. The Court has detailed what Plaintiff's community support basically entails in Section 1(b) (*see supra*, p. 3-4), and these services are, in the Court's opinion, less related to management of Plaintiff's daily life and more akin to an adept friend who occasionally checks in with Plaintiff and helps her fill out applications or accompanies her to a governmental appointment.

The Court finds this constitutes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Barnett*, 381 F.3d at 668. Thus, the ALJ's analysis here has adequate support. While there may be other evidence that could support/disprove any of the ALJ's conclusions in her Paragraph B analysis,[8] this is merely a question of weighing the evidence. Even if reasonable minds could differ here concerning whether these facts correlate to the result obtained by the ALJ, whether the ALJ was correct in her analysis, or whether Plaintiff might ultimately be disabled, such other reasonable minds might disagree and believe the opposite. As in all Social Security disability cases, "there are positive signs and negative signs regarding plaintiff's capabilities in [various] area[s]; these were conflicts that the ALJ had to resolve." *Shaun R. v. Saul*, 2019 WL 6834664, at *5 (N.D. Ill. Dec. 16, 2019). Here, the Court finds the ALJ properly "engaged with both sides of the record – Plaintiff cannot establish error simply because the ALJ "weighed the evidence in a different way than Plaintiff would have liked." *Bertha M. v. Saul*, 395 F. Supp. 3d 963, 972 (N.D. Ill. Sept. 17, 2019). Therefore, the Court must affirm the ALJ's decision as having adequate Paragraph B support. *Elder*, 529 F.3d at 413 (even if reasonable minds could disagree, court must nevertheless affirm denial of benefits if adequately supported).

In support of her Paragraph C arguments, Plaintiff only relies on her own subjective reports of symptoms and the opinions of her psychiatrist and therapists, which ALJ found inconsistent with the record in several respects (discussed in Sections III(b) and (c), *infra*). Moreover, Plaintiff identifies no evidence the ALJ should have considered that demonstrates she has a "marginal adjustment" in adaptation (as defined by the listings, "marginal adjustment" means such fragile adaptation that a person

---

[8]    The Court does not believe the *only* additional evidence cited by Plaintiff related to Plaintiff's Paragraph B limitations (namely, "that the ALJ failed to mention that in addition to the hospitalization, there were several documented instances of self-inflicted [c]uts, one of which resulted in emergency room treatment" [dkt. 10, p. 9]) would have yielded a different result the ALJ had considered it as part of her Paragraph B analysis. While the ALJ did not detail this fact at Step Three, because the Court must read ALJ opinions as a whole to ascertain whether an ALJ considered all of the relevant evidence, it is clear the ALJ *did* consider this evidence when later in her opinion she addressed the exact medical records cited by Plaintiff acknowledging the cutting episodes and emergency room visit, as well as noting that Plaintiff "continued to report ongoing symptoms" despite treatment. [R. 49-50]; *Torre v. Colvin*, 2015 WL 2193861, n. 2 (N.D. Ill. May 7, 2015) (citing *Curvin v. Colvin*, 778 F.3d 645, 649 (7th Cir.2015)); *see also Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir.1985).

is "unable to function outside of [the] home," and may be evidenced by "a significant change in medication" or required hospitalization). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00G2c; *Ribaudo*, 458 F.3d at 583 (plaintiff has the burden of showing his impairments meet a listing, and he must show his impairments satisfy all of the various criteria specified in the listing); *Alesia v. Astrue*, 789 F. Supp. 2d 921, 932 (N.D. Ill. 2011) (citing *Scheck v. Barnhart,* 357 F.3d 697, 700-01 (7th Cir.2004) for the proposition that the "ALJ need not specifically articulate why a claimant falls short of a particular listing unless the claimant has presented substantial evidence that she meets or equals the listing.")). The ALJ explained that she did not find that the evidence established this extreme level of marginal adjustment. [R. 24.] Likewise, the Court was not able to independently identify any information demonstrating this adjustment limitation. To the extent Plaintiff's complaint is about the ALJ's articulation, the Court finds the ALJ's seven-paragraph discussion of the mental impairment listings here sufficient in light of Seventh Circuit case law affirming decisions where ALJs did not discuss even a single listing at Step Three. *See, e.g., Curvin*, 778 F.3d at 650 (affirming a single-paragraph step three finding that "did not specify which impairments he considered and did not specifically discuss the evidence"); *Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004) (affirming despite the fact that ALJ "nowhere expressly referred" to the relevant listing).

Ultimately, the Court cannot find grounds to remand based on the ALJ's Step Three analysis.

**b. Subjective Symptom Analysis**

Next, Plaintiff takes issue with the ALJ's analysis of Plaintiff's subjective symptoms and alleges the ALJ "cherry picked" the evidence and "[i]mpl[ied]" that Plaintiff was not being truthful." [Dkt. 10, p. 11.] Despite these "vigorous assertions," Plaintiff identifies no specific phrases or findings which she criticizes from the ALJ's findings. *Migdalia M v. Saul*, 414 F. Supp. 3d 1126, 1134 (N.D. Ill. 2019) (collecting cases for the proposition that "as always, vigorous assertions do not carry the day; proof is required. Phrased differently, saying so doesn't make it so.")

With respect to an ALJ's subjective symptom analysis, although the SSA has eliminated the use

13

of the term "credibility," this does "not change the fact that ALJs must still assess the credibility of a claimant's assertions regarding [her] symptoms…." *Joseph M. v. Saul*, 2019 WL 6918281, at *7-8 (N.D. Ill. Dec. 19, 2019). The court's review of an ALJ's assessment of a claimant's subjective statements is "extremely deferential." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). If "an ALJ gives specific reasons supported by the record, we will not overturn his credibility determination unless it is patently wrong." *Curvin*, 778 F.3d at 651. The ALJ's analysis of a claimant's allegations does not need to be flawless: "[n]ot all of the ALJ's reasons must be valid as long as *enough* of them are." *Halsell v. Astrue*, 357 F. App'x 717, 722-23 (7th Cir. 2009) (emphasis in original); *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). Only when an ALJ's assessment "lacks any explanation or support…will [the court] declare it to be 'patently wrong.'" *Elder*, 529 F.3d at 413-14.

The Court cannot find anywhere in the ALJ's opinion where she implies Plaintiff was untruthful. Rather, the ALJ notes that she has evaluated the Plaintiff's subjective symptomology, and then goes on to identify "several reasons why the claimant's allegations of debilitating symptoms are neither entirely consistent nor entirely supported by the evidence, and thus do not support additional limitations in the residual functional capacity." [R. 27.] The ALJ's multi-paragraph analysis of the disagreements between Plaintiff's self-report of her symptoms and the evidence covers five major points and spans nine paragraphs. [R. 27-28.]

First, the ALJ noted that in contrast to Plaintiff's testimony and a statement from Dr. Nagarakanti on his opinion form, the record did not establish that Plaintiff's mental health continued to decline over time. [R. 27]. The ALJ cited numerous pieces of record evidence to support this finding, noting that: (1) by February 2016, Plaintiff had stopped her self-injurious behavior and did not resume thereafter [R. 556][9]; (2) in April-May 2016, Dr. Nagarakanti reported Plaintiff was less depressed, and Plaintiff

---

[9]   Plaintiff notes that although she attributed the decrease in self-injury to having no contact with her abusive boyfriend, the Record indicates Plaintiff was still considering letting him move in with her. [R. 556.] Plaintiff goes on to speculate that "No doubt, any reversal in self-injury would be reversed." [Dkt. 10, p. 11.] Although it may be more likely, it does not *necessarily* follow that Plaintiff either returned to the abusive relationship or started to reinjure herself. Nor,

denied sadness, crying spells, and suicidal ideation and had euthymic mood and appropriate affect [R. 596-97]; (3) although Plaintiff reported some sadness and anxiety in subsequent treatment notes, by July 2017 she indicated this was manageable [R. 985], and Dr. Nagarakanti's other mental status findings were consistently normal (oriented, good grooming/hygiene, good eye contact, normal psychomotor activity, no thought disorder, appropriate effect, no ideation) [R. 27, 977, 979, 985, 989]. Based on this analysis, the Court finds the ALJ reasonably concluded that Plaintiff's testimony that her mental condition progressively declined was not borne out by the improved findings documented in these treatment notes.

The ALJ also considered that, in contrast to Plaintiff's report that her mental health declined over time, the record reflects few changes to Plaintiff's medication regimen between May 2016 and March 2018 – she was prescribed the same dosages of Klonopin, Depakote, and Lexapro, with the only difference being discontinuing Trazodone and adding Seroquel.[10] [R. 27, 596, 977.] The ALJ further noted that Plaintiff was able to manage her medications.[11] [R. 27, 799, 811.] It is not unreasonable for the ALJ to infer that Plaintiff's medications would have been adjusted if her mental condition progressively deteriorated as Plaintiff testified. *See, e.g., Vance v. Astrue*, 2013 WL 1136961, at *21 (S.D.W. Va. Mar. 18, 2013) ("there have been no major adjustments in his treatment/medication regimen suggesting any

---

more importantly for the Court's purposes, the Record (*i.e.*, the evidence in this case) does not indicate Plaintiff continued engaging in self-harm in any later-dated progress notes.

[10]    In fact, one record (slightly before this time frame) in particular evinces to the Court the nature of the small changes that were made in response to Plaintiff's complaints: on January 14, 2016, Plaintiff visited Dr. Nagarakanti on an emergency basis because of increased stress and depressive symptoms; Plaintiff asked for a change to her medications. After a 45-minute consult where Plaintiff reported, *inter alia*, that she had superficially cut herself a week prior, Dr. Nagarakanti increased her Lexapro (from 10 mg a day to 20 mg a day), lowered her Klonopin (from 1 mg in the morning and 1 mg in the evening to 1 mg a day), and lowered her Seroquel because Plaintiff reported not taking it and would only take a half tab when she did take it (lowered to 1/2 a tab in the evening instead of a full tab.) Two weeks later, Dr. Nagarakanti noted that Plaintiff "reports that she would like to continue on with the same medications." [R. 571.]

[11]    Plaintiff highlights that she employs a memory aid in remembering to take her medications because she leaves them out on the counter. [Dkt. 10, p. 12; R. 89.] This is the only mention of Plaintiff needing such a memory device in her daily life and all its attendant tasks. The Court does not find this visual memory device persuasive evidence that would have changed the ALJ's opinion concerning whether Plaintiff's subjective reports of the skill of managing her medications was supported by the evidence. Moreover, on multiple dates, Dr. Nagarakanti specifically found Plaintiff "to be capable of independently self-administering medications." [R. 506, 508, 577, 597, 605, 608, 617, 620.]

deterioration of condition").[12] On the other hand, Plaintiff's asserts that "[t]he sheer number of psychotropic medications [Plaintiff] has been prescribed is, in and of itself, evidence of the seriousness of her symptoms." However, the cases cited by Plaintiff for this proposition do not, in fact, stand for this proposition. Both cases cited by Plaintiff, *Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018) and *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004), only bear out the proposition that "strong pain medications corroborate a claimant's credibility regarding the *existence of pain*; neither case speaks to multiple medications being indicative of the existence of a claimant's mental health symptoms, let alone the *seriousness* of such symptoms. Moreover, as the Court recently noted in another case dealing with the issue of medications for mental impairments, "the Court does not find the corroboration between physical pain and prescription narcotics dealt with in *Plessinger* analogous to the situation at hand…Plaintiff has not attempted to show a parallel between mental impairments and medication…Narcotics [for pain] are a unique category of medication without a commonly recognized psychotropic equivalent." *Elizabeth R. v. Saul*, 2020 WL 362792, at *5 (N.D. Ill. Jan. 22, 2020). The same holds true here. Thus, the Court does not find any error in the ALJ's assessment that Plaintiff's testimony about progressive worsening of mental symptoms was inconsistent with the lack of significant adjustment to her medication.

The ALJ was required to consider these medical findings, medications, and course of treatment when evaluating her subjective statements. 20 C.F.R. § 404.1529(c)(2), (c)(3)(iv)-(v). Contrary to Plaintiff's assertions, the ALJ never disputed Plaintiff still (even while managed by medications) had severe mental impairments with ongoing symptoms that significantly limited her functioning. While the ALJ

---

[12]    See also the following non-exhaustive list of cases indicating that physicians routinely adjust medications in response to deterioration or improvement in condition: *Barker v. Astrue*, 2012 WL 4356248, at *4 (D. Colo. Sept. 24, 2012); *Gallamore v. Comm'r of Soc. Sec. Admin.*, 2009 WL 2371503, at *6 (D.S.C. July 31, 2009); *Green v. U.S. Comm'r, Soc. Sec. Admin.*, 2017 WL 7035682, at *5 (W.D. La. Dec. 22, 2017); *Kroh v. Colvin*, 2014 WL 4384675, at *22 (M.D. Pa. Sept. 4, 2014); *Musgraves ex rel. MMM v. Colvin*, 2013 WL 4455626, at *3 (W.D. Mo. Aug. 16, 2013); *Rozeboom v. Colvin*, 2014 WL 3695749, at *8 (N.D. Iowa July 23, 2014); *Steinhoff v. Berryhill*, 2018 WL 306680, at *2 (W.D. Pa. Jan. 5, 2018); *Stickler v. Colvin*, 173 F. Supp. 3d 925, 938 (D.S.D. 2016); *Wright v. Colvin*, 2016 WL 5173523, at *4 (S.D. Ind. Aug. 30, 2016).

acknowledged that Plaintiff continued to report sadness and anxiety in treatment notes [R. 27], the ALJ ultimately concluded that Plaintiff's testimony that her mental health continued to progressively decline over time (*see*, *e.g.*, R. 78, 81, 83) was not fully substantiated by the Record. The Court does not find Plaintiff's argument persuasive that because Plaintiff was encouraged to see a therapist regularly, this encouragement equates to the treatment notes being "far more remarkable than the ALJ implied." [Dkt. 10, pp. 11-12.] Similarly, the Court does not think consideration of the fact that some treatment notes (the same set of ones that the ALJ acknowledged sadness and anxiety; R. 977, 979, 985, 989) showed Plaintiff was not sleeping well, or that she was occasionally tearful during examination, would have changed the ALJ's entire calculus of whether Plaintiff's mental health was on par with her subjective statements; enough of the ALJ's reasons here are valid and supported. *Halsell*, 357 F. App'x at 722-23.

The ALJ also found that Plaintiff's alleged degree of limitation was inconsistent with her performance on mental testing at the consultative examination. [R. 27.] As the ALJ noted, during the mental status portion of the exam, Plaintiff was able to repeat digits forward and backward, recall all items in a delayed recall test, perform serial 3's from 100 to 85 without error, spell "Friday" forward and backward, and had a fair fund of knowledge with awareness of current events. [R. 27-28, 688-89.] The ALJ also noted Plaintiff had "no difficulty" drawing complex and abstract shapes and adequate ability in completing a multi-step drawing task. [R. 28, 689.] Based on this, the ALJ concluded that Plaintiff's alleged degree of limitation was inconsistent with her good performance on the range of psychological testing at the consultative examination. [R. 27-28.] Simply put, the ALJ considered the required medical evidence of record when weighing Plaintiff's reports about her limitations, 20 C.F.R. § 404.1527(c)(2), and the Court cannot say that the ALJ's analysis and conclusions do not reasonably stem therefrom.

The ALJ next concluded that Plaintiff's range of daily activities were not limited to the extent one would expect given her complaints of disabling symptoms and limitations. [R. 28.] Specifically, the ALJ considered Plaintiff's reports that she lived independently, cared for her children, cared for her personal

hygiene, prepared meals, did household chores, drove, and shopped. [R. 28, 375-79, 688.] Contrary to Plaintiff's assertions, the ALJ did not "notably…neglect[] to mention that Plaintiff only has custody of her children three or four days per week, and that she has weekly support services." [Dkt. 10, p. 13.] In fact, this assertion baffles the Court as the ALJ mentioned these *exact* things: "claimant…care[s] for her 3 children who are in her custody 3 to 4 days per week" [R. 28] and "claimant [receives] in-home community support services once per week" [R. 24], demonstrating that she did indeed consider them. As courts read ALJ decisions as a whole, it would be a "needless formality" to require ALJs to repeat redundant discussions of evidence that appear elsewhere in the decision, and we will not do so here. *Rice*, 384 F.3d 363, at n. 5; *Curvin*, 778 F.3d 645, 650 ("[w]e do not discount [an ALJ's discussion of the evidence] simply because it appears elsewhere in the decision. To require the ALJ to repeat such a discussion throughout his decision would be redundant."). Moreover, Plaintiff's own treaters at AID reported that Plaintiff "is able to care of (sic) her daily living needs independently." [R. 580 (June 2015 Behavioral Health Assessment).]

Although Plaintiff disagrees with how the ALJ weighed her daily activities, ALJs are required to consider daily activities in assessing a claimant's subjective allegations, 20 C.F.R. § 404.1529(c)(3)(i), and this was only one factor in the ALJ's analysis. Plaintiff's argument in this respect once again questions the weight the ALJ gave to the evidence. *See Stephens*, 888 F.3d at 327 (subjective disagreement with ALJ's judgment is not a basis for reversal). As before, Plaintiff cannot establish error here simply because the ALJ "weighed the evidence in a different way than Plaintiff would have liked." *Bertha*, 395 F. Supp. 3d at 972. In this case, the ALJ properly considered Plaintiff's daily activities not as conclusive evidence she could work full-time, but instead as one piece of evidence when assessing whether the record supported the extent of limitation Plaintiff alleged. *See Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) (signals and citations omitted) ("it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of her impairments was credible or

exaggerated.").

Lastly, the ALJ noted that Plaintiff testified that although she tried to return to work after her alleged disability onset, she was unable to sustain those jobs because she had increased anxiety in social situations, and the jobs she attempted were social in nature. [R. 28.] Specifically, Plaintiff testified that she worked for six months checking patrons in at the front desk of an aquatic center, but became overwhelmed because there were "so many people" including "kids and everyone running around," and she had difficulty being "around that many people" due to her impairments. [R. 85-88.] The ALJ explained that these positions had been more social in nature, and that the RFC addressed this by including social restrictions which limited Plaintiff to no work with the public as part of routine job duties and only occasional interaction with coworkers and supervisors. [R. 25, 28.] Plaintiff takes issue with the ALJ's consideration of her limits here, but again fails to explain what additional restrictions the ALJ should have included or what record evidence proved such additional restrictions were necessary. As Plaintiff has not met her burden of proving her specific functional restrictions, the Court cannot remand in light of the fact there are no identified "evidence-based restrictions that the ALJ could include in a revised RFC finding on remand." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019); *Weaver v. Berryhill*, 746 F. App'x 574, 579 (7th Cir. 2018) (plaintiff's burden, not ALJ's, to prove specific functional restrictions).

Ultimately, despite her analysis of Plaintiff's subjective statements, the ALJ included extensive functional restrictions in the RFC finding to accommodate Plaintiff, including limitations on: (1) environmental irritants; (2) workplace hazards; (3) task complexity; (4) task changes; (5) social interactions; (6) work pace; (7) tandem work; (8) work rate; (9) decision making; and (10) changes in work setting. [R. 25.] These limitations reflect that the ALJ gave some credit to Plaintiff's statements, "as evinced by the ALJ's decision to limit [Plaintiff's] range of work" significantly when assessing her RFC. *See Schmidt v. Astrue*, 496 F.3d 833, 844 (7th Cir. 2007). As the ALJ considered proper regulatory factors

when weighing Plaintiff's statements, and adequately explained her analysis to the Court's satisfaction as per above, it was not "patently wrong" for her to "tailor an RFC that fit [Plaintiff's] limitations, though not necessarily the intensity to which she testified." *Green v. Saul*, 781 F. App'x 522, 527 (7th Cir. 2019).

Thus, the Court cannot remand the ALJ's opinion based on the subjective symptom analysis.

### c.    Rejection of All Treating Source Opinions

In her last argument, Plaintiff asserts the ALJ's rejection of the opinions of all three of Plaintiff's treaters in favor of two state agency consultants constitutes reversible error. The Court does not agree that the ALJ's analysis was flawed in this respect.

At the outset, it becomes critical to note that two out of three of these treaters at issue, Ms. Janesa Roman, MHP/BA,[13] and Ms. Melissa Kain, QMHP, are not considered "acceptable medical sources" under Social Security rules. 20 C.F.R. § 404.1502(a) (OASDI), § 416.902(a) (SSI). The third treater, Dr. Nageswara Nagarakanti, MD, does qualify as "acceptable medical source."

The Social Security regulations applicable to Plaintiff's claim separate medical evidence into two categories: "acceptable medical sources" and "other sources."[14] The distinction between "acceptable medical sources" and medical sources that are considered "other sources" is important because only "acceptable medical sources" can give medical opinions and be considered treating sources. 20 C.F.R. § 404.1527(a)(2); SSR 06-03p. Acceptable medical sources are limited to licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1502(a) (OASDI), § 416.902(a) (SSI). On the other hand, "other sources" include medical sources, such as nurse practitioners, social workers, and therapists, as well as non-medical sources, such as educational personnel and relatives. § 404.1513(d); Carolyn A. Kubitschek, Jon C. Dubin,

---

[13]    The ALJ misidentifies this provider as James Roman. [R. 29; R.916.]

[14]    The Social Security Administration has adopted regulations applicable to claims filed after March 27, 2017 that amend or rescind many of the regulations applicable to Plaintiff's claims (which were filed as late as July 14, 2016, see fn. 3, *supra*). The Court acknowledges this here in lieu of noting it after each regulation.

*Soc. Sec. Disab. Law & Procedure in Federal Court*, § 2:25 (Jan. 2020 update).

Pursuant to the rules applicable at the time of Plaintiff's disability applications, if a treating physician's opinion is well-supported and is not inconsistent with the other substantial evidence in the record, it is entitled to controlling weight. 20 C.F.R. 404.1527(c)(2). The Seventh Circuit accords great deference to the opinions of treating physicians because of their greater familiarity with the Plaintiff's conditions and circumstances. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). However, "[o]nly 'acceptable medical sources,' such as licensed physicians, can be characterized as treating sources" subject to the treating physician rule. *Phillips v. Astrue*, 413 F. App'x 878, 884 (7th Cir. 2010). There must be some evidence from an "acceptable medical source" for the ALJ to find a medically determinable impairment exists. SSR 06–03p, 2006 WL 2329939 (2006).

Nonetheless, opinions from medical sources that are not "acceptable medical sources" are to be considered by an ALJ too. This is because under applicable Social Security Rulings, "as our health care system changes and evolves, more and more medical professionals who do not qualify as 'acceptable medical sources' are providing medical treatment and evaluation that would have been provided by an 'acceptable medical source' in the past." *Grosjean v. Colvin*, 2014 WL 4494415, at *11 (N.D. Ind. Sept. 12, 2014) (referring to SSR 06-03P). In fact,

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06-03P, 2006 WL 2329939 (S.S.A.). "Opinions from 'other medical sources' may reflect the source's judgment about some of the same issues addressed in medical opinions from 'acceptable medical sources,' including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions. *Grosjean*, 2014 WL 4494415, at *11. Thus, an ALJ should evaluate

"other source" opinions based on the same kinds of factors that are used to evaluate acceptable medical sources, such as the length of the treatment relationship and frequency of examination; the consistency of the opinion with other evidence; whether the treater is a specialist; and the quality of support of the opinion. SSR 06-03p; 20 C.F.R. §§ 404.1527(a)-(d) and 416. 927(a)-(d); *Phillips v. Astrue*, 413 Fed. Appx. 878, 884 (7th Cir.2010) ("In deciding how much weight to give to opinions from these 'other medical sources,' an ALJ should apply the same criteria listed in § 404.1527(d)(2)."). Finally, "[a]lthough the opinions of other medical sources are important and should be considered when evaluating key issues such as impairment severity and functional effects, their findings [alone] cannot establish the existence of a medically determinable impairment." *Phillips v. Astrue*, 413 Fed.Appx. 878, 884 (7th Cir.2010) (citation and signals omitted).

When "treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). ALJs are allowed to give greater weight to the opinions of reviewing doctors than treating physicians in appropriate circumstances. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Schmidt*, 496 F.3d at 843. While the ALJ must provide "good reasons" for how much weight he gives to a treating source's medical opinion, the Seventh Circuit upholds "all but the most patently erroneous reasons for discounting a treating physician's assessment," which is "a very deferential standard." *Collins v. Astrue*, 324 Fed. Appx. 516, 520 (7th Cir. 2009); 20 C.F.R. § 416.927(c)(2); *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015); *Elder*, 529 F.3d at 415. In doing so, "the ALJ need not explicitly discuss and weigh each factor." *Collins v. Berryhill*, 743 F. App'x 21, 25 (7th Cir. 2018). While the ultimate finding of disability is reserved to the Commissioner, *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000), the ALJ still needs to follow the proper steps when discounting the opinion of a treating source.

In the instant matter, the ALJ considered and then rejected the opinions of all three of Plaintiff's mental health treaters, Ms. Janesa Roman, MHP/BA, Ms. Melissa Kain, QMHP, and Dr. Nageswara

Nagarakanti, MD. While the ALJ gave little weight to statements from these mental health providers, she cited many reasons for doing so and supported those reasons with specific record evidence.

As an initial point, Plaintiff complains that the ALJ did not identify Ms. Kain's credentials or discuss the treatment relationship between Plaintiff and Ms. Kain [dkt. 10, p. 14], but this is simply erroneous. In fact, the ALJ pointed out Ms. Kain was a Q.M.H.P. and began providing therapy for the claimant in June 2015, and she discussed Ms. Kain's therapy notes in her decision. [R. 49-50.] Again, it does not matter that the ALJ mentioned this in a prior section of her opinion – it is clear the ALJ was aware of Ms. Kain's credentials and her ongoing relationship as Plaintiff's therapist. It would be a "needless formality" to require the ALJ to repeat this information in her discussion of these providers' opinions. *Rice*, 384 F.3d 363, at n. 5; *Curvin*, 778 F.3d at 650. Likewise, although Plaintiff argues the ALJ failed to identify the nature or length of the treatment relationship Plaintiff had with Dr. Nagarakanti [dkt. 10, p. 15], the ALJ also identified this information earlier in her opinion.[15] [R. 26].

Addressing Ms. Kain's and Ms. Roman's opinions, the ALJ first correctly noted that they are not acceptable medical sources under SSA's regulations. [R. 29.] *See* 20 C.F.R. § 404.1502. Plaintiff is simply mistaken that these providers are "treating therapists" whose opinions fall under the "treating physician rule," as set forth above. The fact that an opinion "did not come from an acceptable medical source" is an "entirely valid" reason for discounting it. *Shaun R.*, 2019 WL 6834664, at *7. Yet the ALJ did not "primarily" rely on this factor, as Plaintiff alleges. The ALJ gave several other reasons why she found Ms. Kain's and Ms. Roman's opinions unsupported by and inconsistent with other evidence in the record. First, the ALJ concluded that their description of the claimant's ongoing symptoms – lack of focus, poor concentration, and impaired memory – was inconsistent with the Plaintiff's performance during mental

---

[15]    Plaintiff makes no similar argument about Ms. Roman, which was curious to the Court because the ALJ does fail to discuss the treatment relationship Plaintiff had with Ms. Roman. However, the Court was unable to find this information in the Record, as there only appears to be a single, undated, two-page letter written by Ms. Roman on Plaintiff's behalf related to Plaintiff's SSDI Request for Reconsideration. [R. 915-16.] The Court suspects this is why the ALJ did not mention the treatment relationship Plaintiff had with Ms. Roman, and why Plaintiff waived this argument.

status testing at the consultative examination. [R. 29; 688-89.] Plaintiff again has a disagreement here with how the ALJ weighed competing evidence in the record, arguing that the ALJ should have disregarded that testing performance and credited her long-term therapists' opinions. [Dkt. 10, p. 15.] However, as ALJs are allowed to consider inconsistencies between opinions and other record evidence in weighing those opinions (20 C.F.R. § 404.1527(c)(4)), the Court cannot second-guess the ALJ's judgment based on Plaintiff's subjective disagreement with how the ALJ resolved this evidentiary conflict. *Stephens*, 888 F.3d at 327; *Bertha M.*, 395 F. Supp. 3d at 972. The ALJ also concluded that Ms. Kain's and Ms. Roman's opinions were inconsistent with the predominantly normal mental status findings documented in Dr. Nagarakanti's treatment notes (*see* Section III(b), *supra*), found their statements about social interaction concerns inconsistent with Plaintiff's own reports of her level of activity and her statements to providers, and concluded that their opinions were otherwise inconsistent with plaintiff's degree of activity.[16] [R. 29.] The Court cannot second-guess the ALJ's judgment on this topic either, as Plaintiff invites it to do.

The ALJ gave little weight to Dr. Nagarakanti's opinion for similar reasons. As the ALJ recounted, Dr. Nagarakanti opined that Plaintiff had severe deficits in all areas of work-related functioning on one form, and rated her as having either the most or second-most limited degree of work functioning in every single area on a second opinion form. [R. 29-30, 772-73, 1052-55.] However, the ALJ concluded these "extreme assessments" lacked record support from Dr. Nagarakanti's own treatment notes, which documented primarily normal findings. [R. 30.] Once again, the ALJ acknowledged that Plaintiff continued to report "some sadness and anxiety" in those notes, but pointed out that the balance of mental

---

[16]    The Seventh Circuit has long held that an ALJ "need not provide a complete written evaluation of every piece of testimony and evidence." *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (citation omitted). This is particularly true here when the Plaintiff asks the Court to remand on the basis that the ALJ failed to "consider how even [Plaintiff's] basic activities would be affected if she did not have the assistance of a case worker, or if she had to care for her children more than half of a week." [Dkt. 10, p. 15.] It is plain to the Court the ALJ knew about these things because she mentioned them in her opinion, discussed *supra*, p. 17-18. [R. 24, 28.] Moreover, there is nothing to suggest Plaintiff's custody arrangement had changed or was going to change, nor did the Record suggest the relationship with Plaintiff's case worker/community support person was going to end if she got a full-time job. The ALJ does not need to consider such wild conjecture or speculation.

status findings were normal, including oriented times three, good grooming/hygiene, good eye contact, normal psychomotor activity, no thought disorder, appropriate affect and mood, and no ideation. [R. 30; 688-89, 977, 979, 985, 989.]. The ALJ also found Dr. Nagarakanti's endorsement of such extreme restrictions inconsistent with the fact that he made few changes to Plaintiff's medication regimen over a longitudinal period (*see* p. 15, *supra*), "which appears contradictory to the idea that the claimant's symptoms have continued to remain unstable or out of control over time." [R. 30, 596, 977.] As with Ms. Kain's and Ms. Roman's opinions, the ALJ again concluded that Dr. Nagarakanti's opinion was inconsistent with the Plaintiff's self-reported activities. [R. 30, 375-79, 688.] These explanations are "sufficiently specific" enough to allow the Court to understand the weight the ALJ gave to Dr. Nagarakanti's medical opinion and the reasons for that weight. *Collins*, 324 F. App'x at 520.

ALJs are allowed to assess whether a physician's opinions are consistent with his or her own treatment notes when weighing those opinions, and ALJs are allowed to discount opinions from treating sources that are unsupported by and inconsistent with the providers' own treatment notes, course of treatment, and other record evidence. *See* 20 C.F.R. § 404.1527(c)(3)-(4) and (6); *also see, e.g., Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) (affirming ALJ's determination that medical findings in treating physician's notes did not support his opinion, noting "[t]he ALJ was allowed to conclude that these notes do not provide adequate clinical support for (treater's) opinion on the residual capacity form."). Thus, because Dr. Nagarakanti's opinion "was not well-supported by medical evidence," the ALJ was allowed to discount it, and provided her reasons for so doing. *See Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2003).

On the other hand, the ALJ gave great weight to the opinions of the psychologists who reviewed the record, Drs. Fritz and Tin, because she concluded their opinions were consistent with the longitudinal improvement in Plaintiff's mental condition documented in Dr. Nagarakanti's treatment notes, with Plaintiff's good performance on mental status testing at the consultative examination, and with the

claimant's recitation of her own activities of daily living, as discussed *supra*. [R. 30.] As the regulations recognize, ALJs are required to consider opinions from reviewing psychologists because those consultants "are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a(b)(1). Furthermore, ALJs are instructed to give greater weight to opinions that are consistent with the overall record, 20 C.F.R. § 404.1527(c)(4), which the ALJ found the opinions of Drs. Fritz and Tin to be.

In sum, the ALJ provided several "good reasons" and adequately explained why she found the record better supported the opinions of the two reviewing psychologists than the opinions of Plaintiff's treating psychiatrist or her therapists. Because the ALJ cited substantial evidence to support her decision to credit the opinions of Drs. Fritz and Tin over the opinions of Dr. Nagarakanti, Ms. Kain, and Ms. Roman, the Court cannot remand on this basis.

## IV.   Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment [dkt. 10] is DENIED; Defendant's motion for summary judgment [dkt. 17] is GRANTED. The Court affirms hereby the final decision of the Commissioner denying benefits.

**ENTERED: 07/16/2020**

Susan E. Cox,
United States Magistrate Judge